FEDERAL–AMERICAN NAT. BANK & TRUST CO. OF WASHINGTON, D. C., v. McREYNOLDS et al.

No. 5610.

Court of Appeals of the District of Columbia.

Argued Jan. 9, 1933.

Decided June 19, 1933.

Rehearing Denied July 10, 1933.

Leon Tobriner and Abner H. Ferguson, both of Washington, D. C., for appellant.

George A. Berry and Joseph J. Malloy, both of Washington, D. C., for appellees.

Before MARTIN, Chief Justice, and ROBB, VAN ORSDEL, HITZ, and GRONER, Associate Justices.

MARTIN, Chief Justice.

An appeal from a decree against appellant for fraud and deceit alleged to have been practiced in an exchange of real and personal property.

It appears that the Merchants' Bank & Trust Company, hereinafter at times called the bank, and the Merchants' Bank Investment Company, hereinafter at times called the investment company, were corporations engaged in business in the District of Columbia, having the same president and board of directors, and the D. C. Realty Company, Inc., was a corporation acting as a holding company for the real estate owned and acquired by the investment company, which owned the capital stock of the realty company. No such relation, however, existed between the realty company and the bank.

It appears that on January 10, 1929, a written contract was executed by and between Joseph McReynolds and the realty company, whereby it was agreed that McReynolds should convey to the realty company a certain improved property, located at the northeast corner of Eighteenth and G Streets Northwest, in the District of Columbia, known as the "McReynolds Apartments," subject to a first deed of trust in the sum of $700,000 and a second deed of trust in the sum of $91,189.76; and that the realty company should convey or cause to be conveyed to McReynolds certain parcels of land situated in the District of Columbia as follows, to wit: (1) The property known as the "Stoneleigh Garage" located at 1630 L Street Northwest, subject to a first deed of trust for $90,000; (2) lots 18 and 19 in square 652, unimproved and free of incumbrances; (3) the property known as "1009 Ninth Street Northwest," subject to a first deed of trust for $16,000; (4) the property known as the "Atlantic Building" located at 928–930 F Street Northwest, subject to a first deed of trust for $200,000; (5) also the following parcels of land in Louisville, Jefferson county, Ky., located at the corner of Third and Main streets, known as "Our Home Life Building," subject to a deed of trust for $50,000; (6) approximately 194 acres of land located near Somerville in Fauquier county, Va., known as the "Heflin Farm," free of incumbrance; (7) approximately 160 acres of land near Somerville, known as the "Bryant Farm," free of incumbrance. The realty company furthermore covenanted and agreed to deliver to McReynolds two certain promissory notes aggregating $125,000, executed by one Mrs. Frazer and secured by second deed of trust on property known as "921 Nineteenth Street Northwest," in the District of Columbia, known as the "Cambridge Apartments," subject to a first deed of trust in the sum of $200,000. It was furthermore agreed that the realty company should lend to McReynolds

the sum of $100,000 to be secured by a second deed of trust on the property known as the "Atlantic Building," and to make a loan to McReynolds within sixty days after the signing of the contract of $50,000 to be secured by pledge of the Frazer notes which he was to secure. It was also agreed that the contract should be consummated simultaneously, on or before February 1, 1929, except that part of the agreement relating to the loan of $50,000 which was to be consummated as aforesaid within sixty days from the execution of the contract. It was further stipulated in the contract that McReynolds should pay the sum of $10,000 to one Shaffer and the bank, and would convey to them the property known as "1009 Ninth Street," as a commission, and that the realty company should pay a commission of $10,000 to the same parties. It was recited in the contract that Shaffer and the bank were acting as agents for all of the parties in the contract, and with their full knowledge and consent, and that the agents were entitled to the stipulated commission for their services. It is agreed that Ellen T. McReynolds, wife of Joseph McReynolds, signed the foregoing contract with her husband, and also the bill of complaint filed below, solely because of her dower interest in the McReynolds Apartment, and that she disclaims any interest in the litigation or in the transaction out of which it arose.

At the time of the execution of the contract the realty company was not the owner of all the property which it was "to convey or cause to be conveyed" to McReynolds. The bank was the owner of the property known as 1009 Ninth Street Northwest, Washington, D. C.; the two farms located in Fauquier county, Va.; and the two Frazer notes amounting to $125,000 named in the contract. The investment company owned the property known as "Our Home Life Building" in Louisville, Ky.; the Stoneleigh Garage, 1630 L Street Northwest, Washington, D. C.; and the two lots known as 18 and 19 in square 632. The realty company held title to the Atlantic Building.

On or before February 1, 1929, conveyances for the parcels of property covered by the contract were executed and delivered by and between the respective parties as provided by the contract, a loan of $100,000 was made by the bank to McReynolds secured by deed of trust upon the Atlantic Building. The Frazer notes were in due time delivered to McReynolds, and a loan of $50,000 was made to him by the bank, and was secured by a pledge of the notes as stipulated in the contract.

Afterwards, to wit, on October 9, 1930, McReynolds (his wife joining) commenced the present case in the Supreme Court of the District of Columbia by filing a bill of complaint against the bank and Peter A. Drury, its president; the investment company; the realty company; and the Federal-American National Bank & Trust Company, as defendants. The bill, as amended, sets out the contract above referred to and alleges among other things that McReynolds had been induced to sign the same by various fraudulent misrepresentations practiced upon him by the defendants, and among them the following, to wit: "That at the time of the execution of said contract of January 10, 1929, and subsequent to its execution and prior to the execution of the deed transferring the McReynolds Apartment to the D. C. Realty Company, the said Merchants Bank and Trust Company was the owner of the aforesaid Frazer notes, that said bank and the said Drury knew the said notes to be worthless and of no value, which fact was wrongly and fraudulently concealed by said defendants, and each of them, from the plaintiffs for the purpose of injuring and defrauding the plaintiffs of their property, and plaintiffs aver that they had no knowledge that said Frazer notes were worthless and of no value until long after the transfer of said McReynolds Apartment to the D. C. Realty Company." The bill also contains the following averments: "That plaintiffs are informed and believe and therefore aver, that said Merchants Bank and Trust Company, while acting as their agents as aforesaid and acting in collusion and in confederation with the said Merchants Bank Investment Company and the D. C. Realty Company, sold said Frazer notes to the Merchants Bank Investment Company for a valuable consideration, the character and amount of which the said Merchants Bank and Trust Company has never disclosed to plaintiffs, but plaintiffs believe, and therefore aver, that said Merchants Bank and Trust Company received from said Merchants Bank Investment Company, in payment of said notes, the equivalent of $125,000.00, in money or in property; that said Merchants Bank Investment Company, acting in collusion with said Merchants Bank and Trust Company, transferred said notes to the D. C. Realty Company, which Company, in turn delivered them to the plaintiffs, in part payment of their property."

It is further alleged in the bill that on

September 18, 1930, the Merchants' Bank & Trust Company and the Federal-American National Bank were consolidated under the name of the Federal-American National Bank & Trust Company; that all of the assets of each corporation passed to the consolidated association; and that the latter became responsible for all the liabilities of every kind and description of each of the consolidating associations existing at the time of the consolidation.

It may be noted at this point that in the bill of complaint filed below, McReynolds does not seek a rescission of his contract with the realty company, nor does he seek a judgment for damages against the realty company or the bank for loss sustained by him by reason of the fraud and deceit of either company. The prayer of the bill is that the defendants be compelled to disclose the amount of the consideration received from the alleged sale of the Frazer notes and to account to plaintiffs therefor, also to account to plaintiffs for all commissions received by them under the contract, also to account to plaintiffs for the consideration received for the sale of "Our Home Life Building" in Louisville, Ky., and that plaintiffs recover the premises known as 1009 Ninth street, or the consideration received therefor if sold.

The defendants filed an answer in which they denied all charges of fraud contained in the bill of complaint. The issue was then tried to the court. The court found upon the evidence that Mrs. Frazer, the maker of the notes in question, was insolvent at the time when the contract was executed, and "did not then and does not now own and possess property subject to execution or other legal process sufficient to pay said notes or any part thereof." The court nevertheless found that subsequent to the execution of the contract on January 10, 1929, and prior to the 1st day of February, 1929, and while acting and designated as the agent of the plaintiffs, the defendant bank without the knowledge and consent of the plaintiffs, and without their authority, sold and delivered to the defendant investment company, the Frazer notes referred to in the contract, and received therefor the sum of $125,000 in cash, and that the bank has not accounted to the plaintiffs for the sum so received by it. The court held that the plaintiffs therefore were entitled to recover from the bank the sum of $125,000 together with interest, less a credit of $50,737.21 and interest, as the amount owing by McReynolds to the bank for money borrowed by him upon the pledge of the Frazer notes. The court

further held that because of the failure of the bank faithfully to perform its duty as the agent of McReynolds it was not entitled to the sum of $4,200 retained by it as compensation and commission provided for in the contract, and that a certain profit of $4,100 realized by it in the transaction between it and Shaffer properly belonged to McReynolds and not to the bank. Accordingly, the court held that McReynolds was entitled to recover from the bank the further sum of $8,300 as aforesaid.

A final decree accordingly was entered by the court against the Federal-American National Bank & Trust Company in the sum of $125,000 together with interest, subject to the credit of $50,737.21 with interest as aforesaid; and for the sum of $8,300 with interest thereon as aforesaid; and the Federal-American National Bank & Trust Company was ordered forthwith to cancel and surrender to McReynolds the promissory note executed by him on July 2, 1930, in the sum of $50,737.21, payable to the defendant the Merchants' Bank & Trust Company and now held by the defendant the Federal-American National Bank & Trust Company as aforesaid. The court dismissed the bill as to the defendants Peter A. Drury, Merchants' Bank Investment Company, and the D. C. Realty Company, Inc. The Federal-American National Bank & Trust Company thereupon perfected the present appeal.

In our opinion the decision of the lower court was erroneous. It is provided in the contract between the realty company and McReynolds that the realty company agrees "to convey, or cause to be conveyed" to McReynolds, the certain properties named in the contract, and to deliver to him the Frazer promissory notes aggregating the sum of $125,000, and to make a loan of $50,000 to McReynolds within sixty days after the signing of the contract to be secured by the notes as collateral, and that the agreement should be consummated on or before February 1, 1929, except as to the loan of $50,000 which was to be consummated within sixty days after the execution of the contract. At the time of the signing of the contract the Frazer notes were the property of the bank which was not a party to the contract nor bound by its terms. It was therefore incumbent upon the realty company in order to fulfill its contract with McReynolds to secure the title to the notes from the bank, otherwise its contract could not have been carried out. By way of securing such title, the investment company, acting in co-operation with the realty company, pur-

chased the notes of the bank, paying therefor the sum of $125,000. The notes were then delivered to McReynolds in compliance with the terms of the contract, and a loan of $50,-000 was made by the bank to McReynolds, who then pledged the notes as collateral security therefor as stipulated in the contract. The transaction between the bank and the investment company was plainly a means of carrying into execution the stipulations of the existing contract. It did not interfere with the rights secured to McReynolds under the contract nor in any manner abridge the same, for McReynolds received and accepted the notes as he was entitled to do under the contract; he also secured the loan of $50,000 and pledged the notes as collateral therefor; and he still owns the notes subject to the debt which he still owes to the bank. Therefore it is clear that the notes did not become the property of McReynolds until the time of their delivery to him, and that the price realized by the bank from the investment company for the notes cannot be recovered by him as money had and received for his benefit. It was not his property which was sold and for which the consideration was received by the bank. It is true that the bank was acting under the terms of the contract as agent for both parties in the matter of carrying out the contract according to its terms, but this stipulation did not deprive the bank of its title to the Frazer notes and its right to sell the same to the investment company in order that the contract might be carried into execution.

Moreover, the Frazer notes constituted but a single one of the items of property covered by the exchange contract. If McReynolds was induced by fraud to enter into the contract, he was entitled upon discovery of the fraud to bring a suit for its rescission and for a recovery of the consideration, or he might affirm it and recover the damages sustained by him. But the suit brought by him had in view neither of these objects. While there were various parties defendant named, it was in fact a suit against the bank, not itself a party to the contract, and in which the relief prayed is a money judgment against the bank for $125,000 on the theory that the bank, having received that sum from the sale of the Frazer notes, was accountable to appellee therefor. As we have shown, there is no foundation for this claim either in the evidence or in the allegations of the bill. The latter, we think, would more consistently support a prayer for relief based on the alleged fraud of the bank in inducing appellee to accept the notes at a sum greatly in excess of their true value, but if the bill be considered as directed to that end, the relief prayed and the relief granted by the lower court are wholly inconsistent with that idea. If plaintiff intended to sue the bank for fraud as agent in the procurement of the contract, or if he intended to sue on the contract on the theory that the bank and the two other defendants, D. C. Realty Company and investment company, were one and the same and that the bank was therefore answerable for the fraud of which he complains, the relief to which he would be entitled, if he proved his case, would be the difference between the value of the property which he received and the value of the property with which he parted under the contract. The measure of damages in such case is the same whether in an action at law or a suit in equity. If the property that was received by McReynolds had been disposed of by him before he became aware of the alleged fraud, or if the property with which he parted had been disposed of by the defendants, the measure of damages would be the difference between the values of the two properties. Such is the rule in the federal courts as enunciated in Smith v. Bolles, 132 U. S. 125, 10 S. Ct. 39, 33 L. Ed. 279, and reaffirmed in Sigafus v. Porter, 179 U. S. 116, 21 S. Ct. 34, 45 L. Ed. 113.

The appellee McReynolds failed to bring such a suit against the appellant; whereas, if he was not damaged under the rule just enunciated he is not entitled to a recovery in respect to the contract or to any of the transactions made necessary in order to consummate the same.

The record contains numerous questions which seem to be unnecessary in view of the conclusion which we reach as above set out.

The decree of the lower court is reversed, with costs, and the cause is remanded for further proceedings not inconsistent herewith.